1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL FLORES,                  )     No. C 03-1340 MMC (PR)
                                 )
            Petitioner,          )     **ORDER DENYING PETITION FOR**
                                 )     **WRIT OF HABEAS CORPUS**
      v.                         )
                                 )
DERRAL ADAMS,                    )
                                 )
            Respondent.          )
_____  )

On December 19, 2002, petitioner, a California prisoner proceeding pro se, filed the

above-titled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  On April 8,

2003, the Court ordered respondent to show cause why the petition should not be granted

based on the cognizable claims contained therein.  Respondent filed an answer, accompanied

by a memorandum and exhibits, and petitioner filed a traverse.

**BACKGROUND**

In 1998, in San Mateo County Superior Court, petitioner was tried and convicted of

multiple felony offenses, including murder, robbery and forcible oral copulation.  Petitioner

thereafter filed an appeal.  The California Court of Appeal summarized the facts adduced in

the 1998 trial of petitioner in San Mateo County Superior Court as follows:

---

[1]The petition initially was misfiled by the Clerk in an earlier case, No. C 02-1703
MMC (PR), and, on March 26, 2003, was filed in the instant case.  On April 8, 2003,
petitioner's motion for leave to amend was granted.  The motion did not include a proposed
amended petition but simply set forth a brief supplemental discussion of petitioner's claims,
which discussion the Court has considered.

The evidence at trial showed that 29-year-old [Michelle] Redmond supported herself and her four-year-old son, Evan, by selling cocaine. Appellant[2] was one of her customers.  On October 5, 1995, Redmond went to appellant's residence to collect on a dishonored check appellant had given her for cocaine.  Appellant had complained to mutual acquaintances that Redmond had given him poor quality drugs, which he described as "bad shit."[3] Redmond's visit to appellant's residence led to her murder.

The identification of appellant as the perpetrator was made at trial by his housemate, Colleen Morales (Morales).  Morales testified that she and appellant were romantically involved when he rented a room at her family's residence, but his insistence on seeing other women strained their relationship. At the time of the murder, appellant was planning to move out.

Morales testified that at around noon on the day of the murder, appellant tried to get her to leave the house, saying that he had business to take care of.[4] Morales refused to leave before it was time for her to go to work.  Appellant seemed agitated, and he made the remark that he was being forced to do something he did not want to do.  Morales testified that at one point she saw appellant swinging a hammer.  He instructed Morales to stay in her room and not to look out the window, that he had business with someone, and that it was none of her business.

Thereafter, after returning to her room, Morales heard a car pull into the driveway and loud voices arguing.  She heard the words "money" and "check;" and at some point, heard a child cry, "mommy."  She decided to leave the house, but realized that she could not move her truck because a car was blocking the driveway.  Morales saw a child in the car.  She returned to her bedroom and closed the door.  She heard "some bangs" on the wall and a female voice saying, "Eddie, I don't want to die."[5]  Morales did nothing because she was afraid.

After the voices stopped, Morales went downstairs.  She walked towards the kitchen, where she saw appellant standing with a needle in his arm.  As she walked further into the kitchen, Morales saw a woman lying on the bloody floor.  Startled, she went back to her room.  She heard a child yell again, "mommy."

---

[2]The "appellant" in the proceedings before the Court of Appeal is the petitioner herein.

[3]Two "mutual acquaintances" of petitioner and Redmond testified.  Tracy Bingham testified that petitioner called Redmond a "cunt," that petitioner told Bingham he had stopped payment on a check because Redmond sold him "some bad stuff," and that Redmond was looking for petitioner shortly before the murder  because "he owed her money."  (Resp.'s Ex. 2, Reporter's Transcript ("RT") at 513.)  Jim Melcher testified that petitioner told him he had stopped payment on a check to Redmond because the drugs were bad, and that Redmond was "extremely irritated" because petitioner owed her money.  (RT at 571-74.)

[4]Morales testified she overheard petitioner telling someone on the phone that they could come over, and that after petitioner got off the phone, "he was really pushing for me to get out of the house."  (RT at 954.)

[5]Appellant's given name was Edward Perreira, but he also used the name Eddie Caruso.  He started using the name Michael Flores when he moved to Northern California in 1982.  His friends still called him "Eddie."

When Morales came out of her room, appellant was in the living room, putting another syringe in his arm. Appellant said something like, "Good stuff, pretty good shit," and that he "felt like eating pussy." Appellant went to Morales, pulled down her pants, and orally copulated her. Morales was afraid to resist.

Appellant stopped and told her he would be back to clean up. He instructed her not to let anyone into the back of the house. Morales then heard the sound of a car backing out of the driveway.[6]

Redmond's BMW was found in the parking lot at the Goodnight Inn in Redwood City on October 11, 1995. Records showed that appellant checked into the motel at 4:22 p.m. on October 5, 1995, paid cash for the room, and checked out on October 6, 1995. The car was locked and the alarm was on. Redmond's purse containing directions to appellant's residence was found in the car. A bank slip showed a withdrawal of $800 from Redmond's account on October 4, 1995, the day before the murder, but no cash was found in the car. There was blood on the driver's side floor and seat, some of which matched appellant's DNA.

Appellant testified in his own defense. At the beginning of his testimony, he acknowledged pleading guilty to the following crimes: a 1976 rape in New York; a 1981 robbery in Southern California; and a 1982 rape and robbery in San Mateo County.[7] He denied killing Redmond. He claimed to have discovered Redmond's dead body near the refrigerator when he came home after going for a walk. He questioned Morales about it, but could get no explanation to appellant's satisfaction. He described Morales as acting "really strange and weird" with "this bizarre look on her face" that "scared the hell" out of him. Appellant explained that he fled the scene because he was an ex-felon on parole; and he did not think anyone would believe he was innocent.

When he went outside the house, he heard someone say, "mommy," and saw a child sitting in a BMW in his driveway. Appellant recognized the car and the little boy as Redmond's son, Evan. He got into the car and drove Evan to his house, where the child walked up to the residence alone. Appellant then drove away. Appellant was arrested several days later after a store clerk at Macy's in San Francisco recognized him from news reports. The coroner who performed the autopsy on Redmond's body testified that the cause of death was "multiple impact injuries to the head and brain." It was his opinion that at least 27 blows were inflicted upon Redmond's head and that a hammer could have caused the wounds. The nature of the wounds indicated "a lot of force to break up the skull to this degree." There was no evidence of a sexual assault.

It was the prosecution's theory of the case that the murder was committed in the course of an attempted rape and robbery, was accomplished by the use of a hammer, and was motivated by a dispute over drugs and money and the victim's resistance to appellant's sexual advances. In support of this

---

[6]Deputy Sheriff Victoria O'Brien ("O'Brien"), the first officer to arrive at the scene, testified she went to the house in response to a 911 call shortly after 2 p.m.. (RT at 59-61.) When she arrived, two men (Colleen Morales's brother, Martin Morales, and his friend Virgil Bradford) told her there was a dead woman in the house; O'Brien found Redmond's body in the hallway adjacent to the kitchen and near the back door, face down in a pool of blood. (RT at 60-62.) Criminologists testified they found Redmond's blood in petitioner's room and on his bed, and that petitioner's bare footprints were found in the blood in his bedroom, the kitchen, the hallway, and the dining room. (RT at 168-69, 199-202, 751-56, 773-78.) There was no sign there had been any attempt to clean up the blood. (RT at 185.)

[7]There was no evidence that Morales had any criminal history.

3

theory, the prosecution presented the testimony of four women [] recounting appellant's prior criminal conduct.

People v. Flores, No. A086471, slip op. at 2-5 (Cal. Ct. App. Jan. 24, 2001) (attached as Resp.'s Ex. 5) (hereinafter "Slip Op.").

The jury found petitioner guilty of first degree murder (Count 1) and first degree robbery (Count 2) of Michelle Redmond ("Redmond"), stealing Redmond's vehicle (Count 3), and forcible oral copulation of Colleen Morales ("Morales") (Count 4).  In addition, the jury found certain sentence enhancements to be true, specifically personal use of a deadly weapon and infliction of great bodily injury.  In a bifurcated proceeding, the trial court found petitioner had sustained five prior "strike" convictions: two for rape and three for robbery.  In February 1999, the trial court sentenced petitioner to a term of 171 years in state prison.

On appeal, the California Court of Appeal reversed the conviction for forcible oral copulation, but otherwise affirmed the judgment.  The California Supreme Court summarily denied the petition for review.  On remand, the trial court resentenced petitioner to a term of 91 years in state prison.  The California Supreme Court summarily denied a subsequent habeas petition.

## DISCUSSION

A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

4

B.       Petitioner's Claims [8]

     1.       Evidence of Prior Offenses

Petitioner claims the admission of evidence of his conduct in the past, and an

instruction to the jury regarding the use of such evidence, violated his constitutional rights.[9]

     a.       Trial Court Proceedings

The California Court of Appeal set forth, in detail, the following background

regarding the admission of evidence of petitioner's past conduct.

> Over appellant's objection, evidence of appellant's predatory behavior
> toward four other women was admitted pursuant to Evidence Code [] sections
> 1101, subdivision (b) and 1108.  Section 1101, subdivision (a) generally
> prohibits admission of character evidence, but evidence of uncharged offenses
> committed by the defendant may be admitted under section 1101, subdivision
> (b) to prove some other fact in issue, such as motive, common scheme or plan,
> preparation, intent, knowledge, identity or absence of mistake or accident.[10]
> (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*); *People v. Wilson* (1992)
> 3 Cal.4th 926, 940).
>      Section 1108, subdivision (a) "created an exception to the existing
> prohibition in section 1101 against the introduction of evidence of a person's
> character or trait of character to prove conduct on a specific occasion.  (See
> Stats. 1995 , ch. 439, § 2)" (*People v. Soto* (1998) 64 Cal.App.4th 966, 983.)
> Consequently, section 1108 goes beyond the limited exceptions in section
> 1101, subdivision (b) and permits evidence of the defendant's prior sexual

---

    [8]Petitioner does not number his claims.  He attaches to his form petition an 82-page brief titled "Statement of Facts," in which, after a 19-page introductory discussion, he sets forth his claims under various unnumbered headings.  Much of the discussion of the claims overlaps and repeats arguments raised in other parts of the brief.  In addressing petitioner's claims herein, the Court has not followed the order in which petitioner raises them in his brief, and for the purpose of clarity, has included citations to the portions of the brief in which the individual claims are discussed.

    [9]Because the first four claims listed by the Court in its Order to Show Cause all pertain to the admission of prior offense evidence and a related jury instruction, they are discussed together in this section of the instant order.

    [10]Section 1101 provides in pertinent part: "(a) . . . [E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act."

offenses as evidence of a disposition to commit such crimes.  (*People v. Falsetta* (1999) 21 Cal.4th 903, 912 (*Falsetta*).)[11]

Pursuant to section 1101, subdivision (b), and section 1108, the prosecution presented the testimony of four women who had been criminally assaulted by appellant:

### Evelyn Clugstone (formerly Cancro)

On December 31, 1979, 22-year-old Evelyn Cancro met appellant while celebrating New Year's Eve in Holiday, Florida.  She testified that when she met appellant, he seemed "very nice, pleasant, gentlemanly," and she accepted his offer to drive her home.  Along the way home, appellant indicated he wanted to show Cancro his house.  Once they got inside, it became clear appellant wanted to have sex with her.  When Cancro would not agree, appellant first knocked her down and then covered her mouth with his hand when she began screaming.  He told her that if she moved or did anything, he would crush her windpipe and "bash [her] face in."  He forced her to disrobe, and over the course of the next two and one-half hours, made her participate in numerous sexual acts, including sexual intercourse, oral copulation, and sodomy.  At one point, after allowing her to go to the bathroom, he entered the bathroom and forced her to orally copulate him again.  He then tied her hands behind her back and gagged her as she sobbed.  He sodomized her again.  When she asked to leave, appellant had her write a note stating that all of the sex acts with him had been consensual.  Appellant was prosecuted for this sexual assault, but was found guilty of misdemeanor battery.

### Deborah Dimopoulos (formerly Castaldo)

Castaldo testified that in January 1982, she was living in Hollywood, California, and appellant was her neighbor.  At about 1:30 a.m., he showed up on her doorstep, saying that he had just been "ripped off" and asking if he could come in.  Castaldo let him in, gave him some coffee, and talked to him.  After some conversation, Castaldo testified appellant's "whole face changed," and he slapped her across the face.  He displayed a knife and demanded that she take off her clothes.  Castaldo began to pray aloud the Lord's Prayer.  Appellant put the knife to her neck and told her that if she screamed, he would kill her.  He stuffed his sock down her throat, gagging her.  Castaldo testified that throughout the next eight hours, she was forced to perform "every possible sexual act," including multiple acts of oral copulation, sexual intercourse, and sodomy.  She testified that at about 10:00 a.m., appellant "seemed to be back to his normal self."  He tied her up, stole her car, and fled.  Appellant was never prosecuted for this offense, but he admitted during his testimony in the instant case that he committed the acts described in Castaldo's testimony.

### Deborah Carlstrom

Deborah Carlstrom testified she dated appellant occasionally when she was living in Los Angeles in 1982.  He offered to help her with the purchase of a used car and advised her to get cash instead of a cashier's check.  The next day, February 9, 1982, Carlstrom withdrew $1000 in 10 $100 bills.  When she returned to her apartment, appellant was in the living room.  He said he would be with her in a second to go look at the car, went into a bedroom, and came out with a gun.  He put a gun to her head, and demanded the money.  After she gave him the money, appellant told her to shut up and not to scream and then left the apartment.  Appellant later pleaded guilty to robbery.

---

[11]According to recently enacted section 1108, subdivision (a): "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

1

***Suzanne Burns (formerly Chen)***

2          Chen testified that on February 28, 1982, she was living in an apartment in San Bruno. When she returned to her apartment that evening with her

3     boyfriend she was surprised to see appellant waiting outside. She was acquainted with appellant because they had worked together at a restaurant in

4     Los Angeles. Appellant was invited inside, where he visited with Chen and her boyfriend for about 40 minutes. Appellant excused himself to use the

5     bathroom, and then returned with a gun. He bound the couple's hands and feet and gagged them. He told them "that if [they] didn't do what he wanted . . . he

6     was going to blow [them] away." He took jewelry, money and other items. During the robbery and while Chen's boyfriend was left bound and gagged in

7     the living room, appellant took Chen into the bedroom where he licked her breasts and raped her. Appellant then stole the victims' car. After appellant

8     was apprehended, he was convicted of rape and robbery and served a prison sentence in connection with this offense.

9          In admitting this evidence under section 1101, subdivision (b), the trial court set out its reasoning in an extensive written ruling.[12] The court had "no

10    difficulty in understanding that in the four prior acts [appellant] harbored an intent to kill if his victim resisted, and that his intent was likely the same in the

11    instant case, where the victim resisted." Two of the incidents (Carlstrom and Burns/Chen) were found relevant to prove appellant "harbored an intent, before

12    the murder, to commit robbery in the instant case." These same prior incidents (Carlstrom and Burns/Chen) were found relevant "in proving [appellant's]

13    motive to commit the forcible oral copulation on Morales." Furthermore, three of the incidents (Clugstone/Cancro, Castaldo/Dimopoulos, and Burns/Chen)

14    were found relevant to prove appellant "acted, on the day of the murder, with a common plan and scheme." The court noted that none of the prior acts were

15    offered to prove identity, notwithstanding the fact that the identity of the perpetrator was a highly disputed issue in this case. The court further found the

16    probative value of the evidence was not substantially outweighed by its prejudicial effect, stating "It is difficult to see how forcible sexual acts, without

17    traumatic injuries – would inflame the jury with respect to the charge that [appellant] bludgeoned [the] victim to death with a hammer."

18          The court also ruled the evidence of appellant's prior sex offenses was independently admissible under section 1108 as evidence of appellant's

19    propensity to commit sexual offenses. However, the court limited the probative value of this propensity evidence to count 4, alleging forcible oral copulation of

20    Morales.[13]

21    Slip Op. at 6-9.

22    _____

23          [12]The trial court also admitted evidence of a fifth prior offense by petitioner (against a Ms. Bonadonna) (CT at 467-78), but such evidence was never introduced at trial and

24    consequently is not discussed herein. The Court notes that in the trial court's written ruling, the events concerning Suzanne Burns ("Burns") are referred to as the "Miller/Chin" offense,

25    based on the last name of Burn's boyfriend ("Miller") and a mis-spelling of Burns's former last name ("Chen"). (Id.)

26          [13]In its pretrial ruling, the trial court had found such evidence of prior sex offenses was not admissible to show petitioner's propensity to commit the charged sexual offense

27    under § 1108. (CT at 469-70.) During trial, however, the trial judge changed his mind and allowed the jury to consider the prior offenses as "propensity" evidence with respect to

28    Count 4, the charge of forcible oral copulation upon Morales. (RT at 761-62, 2251-52.)

7

The trial court gave the jury several instructions limiting the purposes for which the evidence of petitioner's prior offenses could be considered.  Following the testimony of Suzanne Burns ("Burns"), the first of the foregoing witnesses to testify, the trial court instructed the jury that such evidence could not be considered to show petitioner's "bad character, or that he has a disposition to commit crimes," but could only be considered "for the limited purpose" of determining intent and motive.[14]  (RT at 734.)  The court gave similar instructions following the testimony of Deborah Dimopoulos ("Dimopoulos") (RT at 1375/A28-1375/A30) and Deborah Carlstrom ("Carlstrom") (RT at 1397), and again at the close of evidence, (RT at 2364-65).  Following the testimony of both Burns and Dimopoulos, and again at the close of evidence, the trial court further instructed the jury that if they found petitioner had committed a prior sex offense, they could "infer that the [petitioner] had a disposition to commit the same offense," and "that he was likely to commit and did commit" the forcible oral copulation charged in Count 4; on each of the three occasions he gave this instruction, the trial judge clarified that this "exception" only applied to the forcible oral copulation charge in Count 4, and not to the other charges.[15]  (RT at 735-36, 1375/A28-1375/A30, 2364-65.)

In closing argument, the prosecutor offered three different theories of first degree murder.  (RT at 2349.)  First, he asserted the killing was premeditated and deliberate, arguing "twenty-eight hammer blows in two different rooms while you're chasing a victim who's trying to get away from you can't be anything else."  (RT at 2192.)  The prosecutor also asserted the murder was committed in the course of attempted rape, arguing that the prior offenses showed petitioner's motive and intent was to rape Redmond.  (RT at 2192.)  The

---

[14]In the instructions at the close of evidence, the court allowed the jury to consider the prior offense evidence for purposes of determining a common scheme or plan, in addition to intent and motive.  (RT at 2365.)

[15]Similar instructions regarding the proper use of the prior offense evidence under §§ 1101(b) and 1108 were not given after the testimony of Evelyn Clugstone ("Clugstone"), but the instructions at the close of evidence were broad enough to encompass her testimony as well as that of the other witnesses.

prosecutor's third theory was that the murder was committed in the course of a robbery.  (RT at 2195.)

b.      California Court of Appeal Opinion

The California Court of Appeal rejected several claims regarding the admission of the evidence of petitioner's prior offenses.  First, the Court of Appeal found the evidence to be admissible pursuant to California Evidence Code § 1101(b) to show petitioner's "plan, motive and intent to use force and violence to obtain sex and material possessions for himself regardless of whether the victim consented or not."  (Slip Op. at 11.)  The Court of Appeal also found the evidence of the prior sex offenses admissible pursuant to California Evidence Code § 1108, and more probative than prejudicial, pursuant to California Evidence Code § 352.  (Slip Op. at 12-14.)  The Court of Appeal further concluded that the admission of propensity evidence pursuant to § 1108 evidence did not violate the Due Process or Equal Protection clauses of the federal constitution.  (Slip Op. at 14-16.)

The Court of Appeal went on to find the instruction allowing the jury to consider the prior offense evidence to show petitioner's propensity to commit forcible oral copulation, pursuant to former CALJIC No. 2.50.1, violated due process because it could have allowed the jury to convict petitioner based on a mere preponderance of the evidence.[16]  (Slip Op. at 16-17.)  After finding such error to be "reversible per se," the Court of Appeal reversed the forcible oral copulation conviction.  (Slip Op. at 18.)  In addition, the Court of Appeal concluded, there was insufficient evidence to support a conviction on the theory that the murder was committed in the course of a rape of Redmond,[17] but there was "ample" evidence

---

[16]CALJIC No. 2.50.1 was revised in 1999 and, in such revised form, has been found constitutional.  See People v. Reliford, 29 Cal.4th 1007 (2003)

[17]The California Court of Appeal summarized the evidence with respect to this theory as follows:

> In referring to Redmond's murder, the prosecution conceded below, "there is scant evidence of [appellant's] sexual intent. The only physical evidence tending to prove the perpetrator's sexual intent is the fact that her skirt was all the way up to her buttocks when her body was found."  The coroner testified that photographs of the crime scene indicated Redmond's underwear

1   to support the prosecution's alternative felony-murder theory, specifically, that the murder

2   was committed in the course of a robbery of Redmond.[18]  (Slip Op. at 18-20.)  Consequently,

3   based on the latter, factually-supported theory, the Court of Appeal upheld the conviction for

4   murder in the first degree.  (Slip Op. at 21 (citing Griffin v. United States, 502 U.S. 46, 59-60

5   (1991).)

6                  c.        Analysis

7        Petitioner claims the admission of evidence of his prior offenses violated his right to

8   due process.[19]  (Pet. at 8-22, 34-38, 43-49.)  A state court's evidentiary ruling is not subject to

9   federal habeas review unless the ruling violates federal law, either by infringing a specific

10  federal constitutional provision or by depriving the defendant of the fundamentally fair trial

11  guaranteed by due process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984).  The due process

12  inquiry in federal habeas review is whether the admission of evidence was arbitrary or so

13  prejudicial that it rendered the trial fundamentally unfair.  Romano v. Oklahoma, 512 U.S. 1,

14

15                    remained "in place."  He found no evidence of sexual assault
                      when he examined Redmond's body.
16      (Slip Op. at 18-19.)

17          [18]The California Court of Appeal described the evidence with respect to this theory as
18  follows:
                      In contrast to the equivocal evidence of a rape, the evidence of a
19                    robbery was ample.  Appellant does not contend otherwise.  The
                      evidence at trial shows there was animosity between appellant
20                    and Redmond based on an unpaid cocaine debt.  Appellant was
                      seen swinging a hammer before Redmond arrived.  He urged
21                    Morales to leave the house, saying he had business to take care
                      of.  No money was found on Redmond's person despite evidence
22                    showing she had withdrawn $800 from her bank the day
                      preceding her murder.  Once appellant drove away from the
23                    crime scene in Redmond's car, he also had possession of its
                      contents, including the cellular telephone, her purse, and drugs.
24                    There was evidence appellant had a large amount of cash and
                      drugs following Redmond's murder.  Based on the evidence
25                    presented, the jury returned its verdict finding appellant guilty of
                      robbery in the first degree by use of a deadly weapon (a
26                    hammer).
        (Slip Op. at 20.)

27          [19]Petitioner also asserts the admission of such evidence violates the California Rules
28  of Evidence (Pet. at 49); federal habeas relief, however, is not available on the basis of a
    transgression of state law.  See Estelle v. McGuire, 502 U.S. 62, 67 (1991).

10

1   12-13 (1994).  Only if there are no permissible inferences that the jury may draw from the

2   evidence can its admission violate due process.  <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 920

3   (9th Cir. 1991).

4        Here, permissible inferences could be drawn from the evidence of petitioner's prior

5   offenses.  In finding such evidence admissible on the murder, robbery and auto theft charges,

6   the California Court of Appeal discussed admissibility under California Evidence Code §

7   1101(b), as follows:

> While details surrounding the prior acts and the charged acts differed in
> some respects, the incidents themselves were remarkably similar.  Each of
> appellant's prior victims testified they were acquainted with appellant.  Using a
> pretext, he gained access to their residence, or in one case, persuaded the victim
> to come to his residence.  He then quite abruptly and unexpectedly changed his
> demeanor and demanded sex or money.  In each of the cases in which appellant
> forced his victims to participate in sexual acts, appellant threatened them with
> bodily harm if they did not acquiesce in his demands.  In several cases he had a
> weapon, which he displayed in a threatening manner.  In two of these incidents,
> appellant stole the victims' car after perpetrating the sexual assault.  Thus, the
> incidents these four women recounted to the jury, which were filled with
> degradation and violation, were of a similar nature to those reported by
> Morales.
> Furthermore, the fact that four different witnesses testified about similar
> assaults reinforces the relevance of this evidence.  The recurrence of similar
> prior acts tends, increasingly with each instance to negate accident,
> inadvertence, or other innocent mental states.
> In sum, while the prior and present crimes have distinguishing features
> derived from the particular accompanying circumstances, there is a crucial
> unifying similarity that gives the uncharged crimes evidence its probative value
> – the fact that each incident involved a sexual assault and/or theft perpetrated
> against a vulnerable female acquaintance of appellant accomplished in a
> threatening manner.  These prior incidents are sufficiently similar to the
> charged offenses to support an inference that each incident manifested
> appellant's plan, motive and intent to use force and violence to obtain sex and
> material possessions for himself regardless of whether the victim consented or
> not.  In short, appellant's prior misconduct is sufficiently similar to the charged
> offenses to support the trial court's discretionary admission of the evidence
> under section 1101, subdivision (b).

23  (Slip Op. at 11.)  The Court of Appeal went on to find the evidence admissible, for purposes

24  of the oral copulation count, pursuant to § 1108.  (Slip Op. at 12.)  Finally, the Court of

25  Appeal explained why the probative value of the evidence outweighed its prejudicial effect

26  under California Evidence Code § 352, as follows:

> As already discussed, appellant's prior crimes were indicative of a
> predilection to victimize and exploit women appellant had befriended, thereby
> imbuing them with substantial probative value.  The conduct described by the

11

1   various witnesses was not inflammatory when compared to the level of
2   violence in the charged conduct – bludgeoning a victim to death with a hammer
    while her four-year-old son waited for her outside and then sexually assaulting
3   the only surviving witness.  Nor do we find that the evidence was remote when
    appellant's periods of incarceration are taken into account.[20]  The evidence did
    not take an inordinate amount of time to present, nor did it carry with it the
4   probability of confusion.  The jury was aware that appellant did not escape
    punishment for most of the prior assaults, and thus was unlikely to punish him
5   again for the past offenses.  Finally, the evidence was not merely cumulative.
    The prior assaults corroborated Morales's testimony in the present case, and to
6   avoid a "cumulative effect" the court exercised its discretion to limit the
    relevance and admissibility of the prior uncharged offenses to certain contested
7   issues at trial.
            Furthermore, it goes without saying that all evidence relevant to prove
8   the prosecution's case is *necessarily* prejudicial to a criminal defendant accused
    of a crime. . . .
9           Here, the prejudice generated by the evidence of prior assaults was that
    inherent in all damaging prosecution evidence, and was that associated with the
10  very purpose of which the evidence was admitted.  Nor was the evidence
    speculative, inflammatory, in the extreme, or totally dissimilar to the current
11  allegations.

12  (Slip Op. at 13-14) (internal citations and quotations omitted) (emphasis in original).  The

13  Court of Appeal's determination that the evidence was admissible pursuant to § 1101(b), and

14  not rendered inadmissible pursuant to § 352, is a determination of state law binding on this

15  Court.  See Hicks v. Feiock, 485 U.S. 624, 629 (1988).  With respect to whether the

16  admission of such evidence violated petitioner's federal right to due process, it was not

17  "unreasonable" within the meaning of 28 U.S.C. § 2254(d)(1) for the Court of Appeal to find

18  permissible inferences could be drawn from the evidence, insofar as it was relevant to show

19  petitioner's intent, motive, and common scheme or plan, as well as his propensity to commit

20  forcible oral copulation, and that the evidence was not more prejudicial than probative.  As

21  permissible inferences could be drawn from the evidence of petitioner's prior offenses,

22  admission of such evidence did not render the trial fundamentally unfair so as to violate

23  petitioner's right to due process.

24          Petitioner argues the admission of his prior sex offenses, to the extent such evidence

25  was admitted pursuant to § 1108, violated his right to due process because due process

26  prohibits the use of prior offenses to show a defendant's propensity to commit a charged

27

28      [20]The California Court of Appeal does not identify the dates of petitioner's prior
    periods of incarceration.

12

offense.  The admission of prior offenses to demonstrate a defendant's propensity to commit a charged offense does not constitute a violation of due process.  See United States v. LeMay, 260 F.3d 1018, 1024-25, 1031 (9th Cir. 2001) (holding Federal Rules of Evidence 413 and 414, allowing evidence of prior sexual offenses to show propensity to commit charged offense, do not violate Due Process Clause); accord United States v. Enjady, 134 F.3d 1427, 1433 (10th Cir. 1998); United States v. Mound, 149 F.3d 799, 801 (8th Cir. 1998).

Moreover, petitioner's claim that the admission of evidence under § 1108 violated his right to due process is moot in light of the reversal of petitioner's forcible oral copulation conviction, because the propensity evidence was admitted solely to prove petitioner's guilt on the forcible oral copulation charge in Count 4, a limitation about which the jury was clearly and repeatedly instructed.  Specifically, the trial court admitted the evidence of the three prior sex offenses as propensity evidence under § 1108 only with respect to Count 4, the charge of forcible oral copulation of Morales, not with respect to the other charges, (RT at 761-62, 2251-52), and the jury was expressly instructed on three separate occasions that it could consider the propensity evidence only for that limited purpose, (RT at 734-36, 1375/A28-A30, 2365).  Juries are presumed to follow a court's limiting instructions, including those limiting the purposes for which evidence is admitted.  See Richardson v. Marsh, 81 U.S. 200, 206 (1987); Aguilar v. Alexander, 125 F.3d 815, 820 (9th Cir. 1997) (presuming jury followed instruction limiting use of evidence to show "overall pattern of conduct").

In an effort to rebut this presumption, petitioner speculates the jury would be unable to refrain from using the evidence of petitioner's propensity to commit sex offenses to decide he also murdered Redmond in the course of a rape or attempted rape, one of the murder theories argued by the prosecution.  There is nothing in the record to support petitioner's speculation on this point.  The forcible oral copulation of Morales, the only charge for which the propensity evidence was allowed, was a separate crime against a separate victim at a separate time.  Moreover, the rape/murder theory was only one of three alternative theories on which

13

the prosecutor relied; there is no indication the jury decided petitioner had raped or attempted

to rape Redmond or that its verdict on the murder charge rested on such a finding.  Indeed, it

is far more likely the jury convicted on the alternate robbery/murder theory because, for the

reasons set forth by the California Court of Appeal, the evidence that Redmond was robbed

was considerably stronger.  Under such circumstances, petitioner has made an insufficient

showing for purposes of overcoming the presumption that the jury followed the trial court's

limiting instructions and considered the propensity evidence only in connection with the

charge of forcible oral copulation.

Petitioner further claims a due process violation based on the trial court's use of

CALJIC No. 2.50.1 in instructing the jury with respect to its use of propensity evidence in

connection with the charges of forcible oral copulation.  (Pet. at 20, 22-26, 38-40, 41-43.)  As

discussed above, the Court of Appeal found this instruction violated petitioner's right to due

process because it could have been interpreted by the jury as allowing them to convict

petitioner of forcible oral copulation by a mere preponderance of the evidence.  (Slip Op. at

17-18.)  Although CALJIC No. 2.50.1 was given only in connection with the forcible oral

copulation charge, petitioner argues the instruction nonetheless "spilled over" to the murder

charge, such that the jury could have believed it was entitled to convict petitioner of murder

by a mere preponderance of the evidence.[21]  (Pet. at 39.)

Petitioner's argument is not supported by the record.  An instructional error violates

the Due Process Clause only if the error so infected the trial that it rendered the trial

fundamentally unfair.  Estelle, 502 U.S.  at 72.  The challenged instruction "may not be

judged in artificial isolation, but must be considered in the context of the instructions as a

whole and the trial record."  Id.  Here, as discussed above, the trial court explicitly limited

CALJIC No. 2.50.1 exclusively to the forcible oral copulation charge, (RT at 2365), and the

jury is presumed to have adhered to this limitation.  Moreover, the trial court made it

---

[21]To the extent petitioner argues this instruction resulted in error with respect to his conviction for forcible oral copulation, such argument is moot in light of the reversal of that conviction on appeal.

1   abundantly clear in its other instructions that the prosecution had to prove petitioner's guilt

2   "beyond a reasonable doubt."  In particular, the court, at the outset, instructed the jury

3   pursuant to CALJIC Nos. 2.01 and 2.90, in each instance making it clear the prosecution had

4   the burden of proof and, specifically, the burden of proving petitioner guilty "beyond a

5   reasonable doubt."  (CT at 1029-30, 1066.)  Thereafter, in the instructions on felony murder,

6   as well as on the degree of murder, the trial court reiterated the prosecution's burden of

7   proving petitioner's guilt "beyond a reasonable doubt."  (CT at 1082-83, 1089.)  In addition,

8   the trial court repeated the beyond-a-reasonable-doubt standard in specific instructions to the

9   jury regarding adverse inferences, identity, specific intent, the degree of robbery, lesser-

10  included offenses, the element of fear for robbery, the intent element for oral copulation, the

11  gun enhancement, and the great bodily injury enhancement.  (CT at 1029-30, 1057, 1068,

12  1073, 1091, 1101-02, 1104, 1112, 1121, 1123-24.)  As the jury was specifically instructed

13  not to apply CALJIC No. 2.50.1 to the murder charge, and was repeatedly reminded

14  throughout the instructions that the prosecution had to prove petitioner's guilt of such charge

15  beyond a reasonable doubt, the jury could not have believed it needed only to find petitioner

16  guilty of murder by a preponderance of the evidence.  Accordingly, the use of CALJIC No.

17  2.50.1 did not violate petitioner's right to due process.

18      Lastly, petitioner claims the admission of his prior sexual offenses, to the extent such

19  evidence was admitted under § 1108, violated the Ex Post Facto Clause, (RT at 27-34),

20  because § 1108 became effective after the date of the alleged offense as to which such

21  evidence was admitted.[22]  Like the due process challenge to the admission of evidence

22  pursuant to § 1108, addressed above, this claim is moot in light of the reversal of petitioner's

23  forcible oral copulation conviction.  In addition to being moot, the claim is meritless.  A new

24  evidentiary rule violates the Ex Post Facto Clause only if it changes the quantum of evidence

25  needed to convict, a change not effectuated by § 1108.  See People v. Fitch, 55 Cal.App.4th

26  172, 182-83, 186-87 (1997) (rejecting ex post facto challenge to § 1108; finding that

27  _____

28      [22]Section 1108 was enacted in 1995, after petitioner committed the offenses, but prior
    to his trial.

1   although it added to the evidence the jury could consider, it did not lessen the prosecution's

2   burden of proving guilt beyond a reasonable doubt); cf. Carmell v. Texas, 529 U.S. 513, 529-

3   52 (2000) (reversing convictions on ex post facto grounds where, after crimes were

4   committed, law precluding conviction without corroboration of victim was amended to allow

5   conviction based on victim's testimony alone).

6       In sum, the admission of the evidence of petitioner's prior offenses did not violate

7   petitioner's right to due process, because permissible inferences could be drawn therefrom

8   and the evidence was not so prejudicial as to render the trial fundamentally unfair.  Nor did

9   the use of a former version of CALJIC No. 2.50.1 violate petitioner's right to due process

10  with respect to the murder charge, because such instruction did not lessen the prosecution's

11  burden of proof on that charge.  Lastly, there was no violation of the Ex Post Facto Clause by

12  reason of the admission of the prior sex offenses to show petitioner's propensity to commit

13  forcible oral copulation, pursuant to California Evidence Code § 1108, as any such claim is

14  moot in light of the reversal of petitioner's forcible oral copulation conviction on appeal and,

15  in any event, lacks merit.

16      Accordingly, petitioner is not entitled to habeas relief on this claim.

17      2.   Severance

18      Petitioner claims the trial court's denial of his pretrial motion to sever the trial of the

19  forcible oral copulation charge from the trial of the murder, robbery, and car theft charges

20  violated his right to due process.  (Pet. at 9-10, 50-63.)  In ruling on the motion to sever, the

21  trial court found the charges "were committed at the same location, within five to fifteen

22  minutes apart, and one victim (Morales) is a percipient witness to the murder of the victim."

23  (Resp.'s Ex. 1, Clerk's Transcript ("CT") at 464.)  The trial court further found the evidence

24  cross-admissible with respect to the forcible oral copulation charge and the other charges,

25  that the case against petitioner on the two sets of charges were of similar strength, and that

26  severance would waste time and resources.  (CT at 465-66.)  Petitioner did not raise this

27  claim in his direct appeal, but rather in his habeas petition to the California Supreme Court,

28  which petition was summarily denied.

1    A joinder, or denial of severance, of co-defendants or counts may prejudice a

2    defendant sufficiently to render his trial fundamentally unfair in violation of the right to due

3    process.  Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997).  A federal court reviewing a

4    state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing

5    severance or joinder in state trials.  Id.  Rather, a federal petitioner must demonstrate that the

6    denial of his severance motion resulted in prejudice great enough to render his trial

7    fundamentally unfair.  Id.

8    A number of factors bear on a trial court's determination of the issues of consolidation

9    and severance.  The risk of prejudice from joinder of charges decreases where the evidence

10   on the joined charges is cross-admissible.  See Davis v. Woodford, 333 F.3d 982, 991 (9th

11   Cir. 2003).  Petitioner contends he was prejudiced by the joinder of all charges in a single

12   trial because the evidence of his four prior offenses would not have been admissible at a

13   separate trial on the charges of murder, robbery, and car theft.  The California Court of

14   Appeal upheld the trial court's ruling, however, that with respect to the murder, robbery and

15   car theft charges, the evidence of petitioner's four prior offenses was admissible under

16   California Evidence Code § 1101(b) to show petitioner's intent and a common scheme or

17   plan.[23]  (Slip Op. at 11).  The state court's determination as to the admissibility of the

18   evidence under California law is binding on this Court.  See Hicks v. Feiock, 485 U.S. at

19   629.  In addition, even if the murder, robbery, and auto theft charges had been tried

20   separately from the oral copulation charge, evidence of the forcible oral copulation would

21   have been introduced at that separate trial because the victim of the forcible oral copulation

22   was a percipient witness to the murder, which had occurred less than 15 minutes earlier at the

23   same location.  Consequently, the risk of prejudice from the joinder is significantly

24

25

26   [23]Specifically, and as described in greater detail above, the trial court found one of the
     four prior offenses relevant to show petitioner's intent "before the murder, to commit
27   robbery," a second prior offense relevant both to show such intent and to show petitioner
     "acted, on the day of the murder, with a common plan and scheme," and the other two prior
28   offenses relevant to show such a common plan and scheme.  (CT at 467-78.)

1   diminished by the cross-admissibility of evidence with respect to the forcible oral copulation

2   charge and the other charges.

3        Further, to the extent evidence is not cross-admissible, the risk of prejudice is

4   decreased where the danger of "spillover" from one charge to another has been diminished,

5   as occurs where, under the trial court's instructions, the jury is able to "compartmentalize"

6   the evidence. <u>Bean</u>, 163 F.3d at 1085-86.  Here, the  forcible oral copulation was performed

7   on a different victim and was based on acts that clearly were distinct from the acts

8   constituting the murder, robbery, and car theft.  The Court has considered the fact that

9   although the prior offenses were admissible under § 1101(b) with respect to the murder,

10   robbery and auto theft charges, three of those prior offenses also were admitted to show

11   propensity with respect to the forcible oral copulation charge.  As noted herein, however, the

12   trial court instructed the jury on three separate occasions that such evidence could only be

13   used to show petitioner's propensity to commit the forcible oral copulation, and not the other

14   crimes.  In doing so, the trial court in essence instructed the jury to compartmentalize the

15   purposes for which the prior offense evidence could be used.  (RT at 734-36, 1375/A28-A30,

16   2365.)  The jury is presumed to have followed such instructions.  <u>See</u> <u>United States v. Cihak</u>,

17   137 F.3d 252, 259 (9th Cir. 1998).

18        The risk of prejudice from joinder of separate crimes decreases, moreover, when the

19   evidence as to one crime is not substantially weaker than the evidence as to the other crime.

20   <u>See</u> <u>Davis</u>, 333 F.3d at 991; <u>Bean v. Calderon</u>, 163 F.3d 1073, 1084-85 (9th Cir. 1998).

21   Petitioner argues that a weak murder case was joined with a strong oral copulation case.  The

22   case against petitioner on the murder charge was not weak, however.  As explained by the

23   California Court of Appeal, the evidence that petitioner murdered Redmond while robbing

24   her was "ample":

25           The evidence at trial shows there was animosity between appellant and
    Redmond based on an unpaid cocaine debt.  Appellant was seen swinging a

26       hammer before Redmond arrived.  He urged Morales to leave the house, saying
    he had business to take care of.  No money was found on Redmond's person

27       despite evidence showing she had withdrawn $800 from her bank the day
    preceding her murder.  Once appellant drove away from the crime scene in

28       Redmond's car, he also had possession of its contents, including the cellular

1
2
3

> telephone, her purse, and drugs.  There was evidence appellant had a large
> amount of cash and drugs following Redmond's murder.   Based on the
> evidence presented, the jury returned its verdict finding appellant guilty of
> robbery in the first degree by use of a deadly weapon (a hammer).

4
5
6
7

(Slip Op. at 20.)  Moreover, both the forcible oral copulation charge and the other charges depended largely on the testimony of Morales, and thus the relative strength of her credibility would apply equally to both sets of charges.  As a result, this was not a case in which a weak case was joined with a strong case.

8
9
10
11
12

In sum, given the cross-admissibility of the evidence, the distinct nature of the crimes, the trial court's instructions to the jury with respect to compartmentalizing the use of evidence to show propensity, and the lack of an imbalance in the relative strength of the evidence on the various charges, petitioner was not so prejudiced by the denial of the severance motion that he was deprived of his right to a fair trial.

13

Accordingly, petitioner is not entitled to habeas relief on this claim.

14

            3.      Insufficiency of Evidence on Rape/Murder Theory

15
16
17
18
19
20
21
22

In the midst of his claims challenging the admission of the evidence of his prior offenses, petitioner briefly makes an additional claim that because there was insufficient evidence to support the first degree murder conviction based on a rape/murder theory, the conviction must be reversed.  (Pet. at 40-41.)  The California Court of Appeal correctly applied Griffin v. United States, 502 U.S. 46 (1991), in rejecting this claim.  See id. at 59-60 (holding guilty verdict need not be reversed where theory lacking evidentiary support presented to jury along with alternate theories for which evidence sufficient; finding jurors "well equipped" to disregard factually inadequate theory).

23

Accordingly, petitioner is not entitled to habeas relief on this claim.

24

            4.      Testimony by Monica Hardeman

25
26
27
28

Petitioner claims the admission of testimony by Monica Hardeman ("Hardeman"), Redmond's sister, violated his right to due process and his Sixth Amendment right to confrontation.  (Pet. at 64-74.)  Hardemen testified that one or two weeks prior to her sister's death, she let herself into Redmond's house and heard Redmond on the telephone upset and

1    crying.  (RT at 849-50.)  Hardeman testified that Redmond kept saying she was not selling

2    drugs anymore, and telling the caller, whom she referred to as "Eddie," not to call her house.

3    (RT at 865-66.)  Hardeman testified that she knew petitioner as "Eddie Flores."  (RT at 847.)

4    Defense counsel objected to the evidence as hearsay, more prejudicial than probative, and a

5    violation of the Sixth Amendment right to confrontation.  (RT at 850, 856-57, 862.)  The

6    prosecutor explained that the evidence was not being offered for its truth, i.e. that Redmond

7    was not selling drugs anymore, but rather to show Redmond's state of mind, as well as

8    petitioner's motive to kill her, i.e., that he was angry she refused to sell him more cocaine.

9    (RT at 851-55.)  The trial court admitted the evidence for the limited, non-hearsay purpose of

10   showing petitioner's motive, and instructed the jury accordingly immediately after Hardeman

11   testified.  (RT at 851-57, 861-63, 866.)  Petitioner did not raise this claim on direct appeal,

12   but rather in his habeas petition to the California Supreme Court, which petition, as noted,

13   was summarily denied.

14        As described above, the admission of evidence violates the Due Process Clause only if

15   there are no permissible inferences the jury may draw therefrom.  See Jammal, 926 F.2d at

16   920.[24]  Here, the jury could draw a permissible inference from Hardeman's testimony that

17   petitioner had a motive to kill Redmond in that he was angry at her for not selling him drugs.

18   Moreover, the admission of Hardeman's testimony does not implicate the Confrontation

19   Clause, because it was not admitted for the truth of the matter stated but rather for the non-

20   hearsay purpose of demonstrating petitioner's motive.  The Confrontation Clause does not

21   bar the use of out-of-court statements for purposes other than establishing the truth of the

22   matters asserted therein.  Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004); United States

23   v. Inadi, 475 U.S. 387, 398 n.11 (1986); Tennessee v. Street, 471 U.S. 409, 414-15 (1985).

24        Accordingly, petitioner is not entitled to habeas relief on this claim.

25

26        [24]Petitioner's argument that the admission of such evidence violates federal and state
     evidentiary rules does not provide a cognizable basis for federal habeas relief.  (See Pet. at
27   64-67.)  The Federal Rules of Evidence are inapplicable to state court proceedings, and, as
     noted above, federal habeas relief is not available on the basis of a violation of state
28   evidentiary rules.  See Estelle, 502 U.S. at 67.

1        5.        CALJIC No. 17.41.1

2        Petitioner claims the use of CALJIC No. 17.41.1, which instructs jurors to inform the

3 court of other jurors' misconduct, violated his right to a unanimous jury.  (Pet. at 83-88.)

4 This claim has been rejected by the Ninth Circuit, which has held the use of CALJIC No.

5 17.41.1 is neither contrary to nor an unreasonable application of Supreme Court precedent.

6 See Brewer v. Hall, 378 F.3d 952, 955-56 (9th Cir. 2004) (rejecting under AEDPA habeas

7 claims based on the use of CALJIC No. 17.41.1).

8        Accordingly, petitioner is not entitled to habeas relief on this claim.

9        6.        Cumulative Error

10        Petitioner claims that the cumulative effect of all of the foregoing asserted trial errors,

11 caused his trial to be fundamentally unfair, in violation of his right to due process.  (Pet. at

12 77-79.)  Petitioner cites no Supreme Court precedent, and the Court is aware of none,

13 providing that the cumulative effect of numerous alleged errors, none of which is of

14 constitutional dimension, may violate a defendant's due process right to a fair trial.  As

15 discussed above, AEDPA mandates that habeas relief may be granted only if the state courts

16 have acted contrary to or have unreasonably applied federal law as determined by the United

17 States Supreme Court.  Williams (Terry) v. Taylor, 529 U.S. 362, 412 (2000) ("Section

18 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's

19 jurisprudence.").  Consequently, in the absence of Supreme Court precedent recognizing a

20 claim of "cumulative error," habeas relief cannot be granted on such theory.

21        In any event, to the extent such a claim has been recognized by the Ninth Circuit,

22 where there is no single constitutional error, there is noting to accumulate to the level of a

23 due process violation.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002); Fuller v.

24 Roe, 182 F.23d 699, 704 (9th Cir. 1999).  Here, for the reasons discussed above, there has

25 been no constitutional error, and thus there can be no "cumulative error."  Accordingly,

26 petitioner's claim, even if it had a basis in United States Supreme Court precedent, fails.

27        Petitioner makes a seemingly related argument that any cumulative error must be

28 measured under the "harmless error" standard set forth in Chapman v. California, 386 U.S.

18 (1967).  (Pet. at 80-82.)  The Court disagrees.  To begin with, for the reasons discussed herein, there are no errors upon which to conduct a harmless error analysis.  Further, even if there were any such errors, the appropriate standard is not the standard set forth in Chapman, but rather the less stringent standard set forth in Brecht v. Abrahamson, 507 U.S. 619, 629-30 (1993).  Id. at 637.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 7.    Ineffective Assistance of Appellate Counsel

Lastly, petitioner asserts his appellate counsel provided him with ineffective assistance by failing to raise all of the claims petitioner raises herein.  (Pet. at 75-77.)  The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal.  Evitts v. Lucey, 469 U.S. 387 (1985).  In evaluating such a claim, the federal court applies the standard set forth in Strickland v. Washington, 466 U.S. 668, 686-88, 694 (1984).  See Smith v. Robbins, 528 U.S. 259, 285 (2000).  In the instant case, appellate counsel raised the claims discussed herein with respect to the admission of the prior offense evidence, as well as the jury instructions concerning those offenses, and juror misconduct.  Although appellate counsel did not raise the other claims petitioner raises herein, those claims, for the reasons discussed above, are without merit.  An appellate lawyer's failure to raise a meritless claim is neither unreasonable nor prejudicial.  Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989) (noting that one of "hallmarks of effective appellate advocacy" is weeding out weaker issues); see also Jones v. Barnes, 463 U.S. 745, 751 (1983) (holding appellate counsel has no duty to raise every nonfrivolous claim requested by appellant).  Consequently, petitioner did not receive ineffective assistance of appellate counsel, nor was he prejudiced by the manner in which his appeal was conducted.

Accordingly, petitioner is not entitled to habeas relief on this claim.

//

//

//

**CONCLUSION**

For the reasons discussed, the petition for a writ of habeas corpus is hereby DENIED. The Clerk shall close the file.

IT IS SO ORDERED.

DATED: February 7, 2007

_____
MAXINE M. CHESNEY
United States District Judge

23